# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| FRANCISCO DIAZ, | ) | CASE NO. 1:17CV1602 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Francisco Diaz, ("Plaintiff" or "Diaz"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

## I.  PROCEDURAL HISTORY

In August 2014, Diaz filed an application for POD, DIB, and SSI, alleging a disability onset date of July 16, 2014 and claiming he was disabled due to diabetes and a left hand impairment.  (Transcript ("Tr.") 168, 172, 199.)  The applications were denied initially and upon reconsideration, and Diaz requested a hearing before an administrative law judge ("ALJ").  (Tr. 134.)

On February 12, 2016, an ALJ held a hearing, during which Diaz, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 42.)  On March 11, 2016, the ALJ issued a written decision finding Diaz was not disabled.  (Tr. 23.)  The ALJ' s decision became final on June 15, 2017, when the Appeals Council declined further review.  (Tr. 2.)

On July 31, 2017, Diaz filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 13, 15.)  Diaz  asserts the following assignments of error:

> (1) Dr. Jeet was Mr. Diaz's treating endocrinologist since 2012 and offered several opinions.  The ALJ failed to indicate what weight he assigned to the doctor's opinions.  The reasons offered by the ALJ to discount Dr. Jeet's opinions were vague and in some instances were contradicted by the record.  Did the ALJ comply with the mandates of the treating physician rule in evaluating Dr. Jeet's opinions?
>
> (2) According to SSR 96-7p, the RFC must accurately portray the claimant.  Mr. Diaz's diabetes progressed to hypoglycemic unawareness and because of this, he loses consciousness without warning or without the ability to control his symptoms.  Dr. Jeet said these symptoms were very dangerous for himself and those around him.  Should the ALJ have included these limitations in the RFC and hypothetical question posed to the VE?

(Doc. No. 12.)

2

## II.   EVIDENCE

**A.     Personal and Vocational Evidence**

Diaz was born in September 1977 and was 38 years-old at the time of his administrative hearing, making him a "younger" person under social security regulations.  (Tr. 63.)  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  He has a high school education and is able to communicate in English.  (Tr. 100.)  He has past relevant work as an information clerk.  (Tr.35.)

**B.     Medical Evidence**[2]

On September 17, 2012, Diaz first visited endocrinologist Anant Jeet, M.D., for diabetes management.  (Tr. 236.)  Diaz reported he was currently taking insulin injections and monitoring his blood glucose 1-2 times a day.  (*Id.*)  He indicated dramatic fluctuations in his home blood glucose levels.  (*Id.*)  Diaz's physical examination was overall normal.  (Tr. 237.)  Dr. Jeet concluded Diaz's diabetes was uncontrolled and adjusted Diaz's diabetic medications.  (Tr. 237, 238.)

Diaz continued to visit Dr. Jeet on a regular basis.  In October 2012, his blood glucose levels continued to fluctuate dramatically.  (Tr. 241.)  Diaz reported a recent hypoglycemia episode at work, in which his blood glucose level was in the 70s.  (*Id.*)  On November 14, 2012, Diaz's blood glucose was again fluctuating.  (Tr. 245.)  His A1c level[3] was 7.8.  (*Id.*)  On January

---

[2]     The Court notes its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  Moreover, Diaz has cited to evidence relating to his mental impairments.  Because Diaz's assignments of error deal exclusively with his physical impairments, the Court will not include a review of this evidence in its decision.

[3]     The A1c is a blood test which reveals a patient's average blood sugar level.  It is a test used to both diagnose and monitor the management of diabetes.  The higher the A1c level, the poorer the patient's blood sugar control.  *See Hodge v. Comm'r*

3

10, 2013, Diaz reported his symptoms had been worsening and his home blood sugar was still fluctuating.  (Tr. 250.)  Dr. Jeet renewed Diaz's medications.  (Tr. 251.)

On January 24, 2013, Diaz reported to Dr. Jeet he recently experienced another hypoglycemia episode at work.  (Tr. 254.)  He admitted he had not been checking his sugar level at work.  (Tr. 254.)  Dr. Jeet advised Diaz he needed to check his glucose 6-7 times a day.  (Tr. 254, 255.)

Diaz returned to Dr. Jeet on February 27, 2013 and requested a note for work.  (Tr. 258.) He indicated he had been having low blood sugar readings and had another hypoglycemia episode while at work.  (*Id*.)  Dr. Jeet and Diaz discussed an insulin pump and Dr. Jeet adjusted Diaz's medication dosages.  (Tr. 258, 259.)  On March 18, 2013, Diaz's A1c level was 7.0.  (Tr. 293.)

On May 3, 2013, Dr. Jeet noted Diaz's disease course had been improving, but his blood sugars were still fluctuating.  (Tr. 262.)  Diaz's diabetes remained uncontrolled and his A1c was 7.0.  (Tr. 263.)

Diaz returned to Dr. Jeet on January 29, 2014, indicating he was only monitoring his blood glucose 1-2 times a day.  (Tr. 265.)  His blood glucose was still fluctuating dramatically and his A1c level was 7.2.  (*Id*.)  On April 29, 2014, Diaz was still only monitoring his blood glucose 1-2 times a day and his blood glucose levels continued to fluctuate.  (Tr. 269.)  His A1c was a 7.4.  (*Id*.)

On June 13, 2014, Diaz reported a recent episode of hypoglycemia and a seizure to Dr. Jeet.  (Tr. 339.)  Dr. Jeet noted Diaz was still not testing his glucose often enough.  (*Id*.)  Diaz's

_of Soc. Sec.,_ 2015 WL 853472 *2, n. 2 (N.D. Ohio Feb. 26, 2015).

4

blood glucose reading was 63 at this office visit and his A1c level was 7.4.  (*Id*.)  On July 17, 2014, his A1c had improved to 6.2, but his blood sugar levels were still fluctuating dramatically.  (Tr. 273.)  Dr. Jeet recommended Diaz check his blood sugar 6-7 times a day, rather than 1-2 times a day.  (Tr. 273, 275.)  Dr. Jeet concluded Diaz would "not be able to work due to brittle type 1 diabetes."  (Tr. 275.)

On September 5, 2014, Diaz visited optometrist Paul J. Alton, O.D., for an eye examination.  (Tr. 414.)  Diaz's vision was 20/20 with best correction.  (*Id*.)  His eye examination was overall normal, however, fundus photos indicated some abnormalities.  (Tr. 415, 416.)  Dr. Alton diagnosed background diabetic retinopathy in both eyes and referred Diaz to an ophthalmologist.  (Tr. 415, 416.)

On September 19, 2014, Diaz consulted with ophthalmologist Jermone P. Schartman, M.D.  (Tr. 417.)  Diaz reported he currently had no vision problems, but he did have an episode in December 2013 where his right eye vision went dark for about 20 minutes.  (*Id*.)  He denied any additional episodes since then.  (*Id*.)  Dr. Shartman noted while Diaz's blood sugar levels were not controlled, his retinopathy was not yet severe and did not require treatment.  (*Id*.)  Dr. Shartman observed no obvious ischemia or neovascularization in either eye.  (*Id*.)  Dr. Shartman advised Diaz to improve his blood sugar control and return for a retinal examination in a year.  (*Id*.)

Diaz returned to Dr. Jeet on September 15, 2014, indicating his blood sugars were fluctuating between 15 and 200.  (Tr. 390.)  Dr. Jeet noted Diaz's symptoms included hypoglycemia unawareness.  (*Id*.)  His A1c was 6.4.  (Tr. 391.)  Dr. Jeet encouraged Diaz to test his blood sugar levels 5-6 times daily.  (Tr. 392.)

5

On October 6, 2014, Dr. Jeet provided the following statement regarding Diaz:

> It is my medical opinion that Francisco Diaz is unable to work at this time and will be unable to work until further notice.  He is a type I diabetic that I have been treating since 9/17/12 and due the severity of his diabetes it would be harmful for himself or to others for him to be in a work environment.

(Tr. 346.)[4]

On December 15, 2014, Dr. Jeet noted Diaz was still only monitoring his blood glucose 1-2 times a day and his blood sugar was fluctuating dramatically.  (Tr. 394.)  Dr. Jeet again listed hypoglycemia unawareness as a symptom.  (*Id*.)  His A1c was 6.9.  (Tr. 395.)  Diaz returned to Dr. Jeet on January 26, 2015, with an A1c of 7.4 and continuing blood sugar fluctuation.  (Tr. 441, 443.)

On December 23, 2014, Diaz's optometrist, Paul J. Alton, O.D., filled out a form regarding Diaz's ocular history.  (Tr.  411 - 413.)  He listed Diaz's diagnoses as myopia, astigmatism, and moderate non-proliferative diabetic retinopathy in both eyes.  (Tr. 411.)  He indicated Diaz's vision was 20/20 for both distance and reading, with best correction.  (*Id*.)  Dr. Alton reported Diaz had no visual impairment.  (Tr. 413.)

Diaz returned to Dr. Jeet on January 26, 2015, reporting he was now monitoring his blood glucose 5 times a day, but his blood sugar levels were still fluctuating dramatically.  (Tr. 441.)

---

[4]     The Court notes Diaz, in his Brief, references a June 26, 2015 letter from Dr. Jeet, in which Dr. Jeet concluded Diaz was unable to participate in community service. (Tr. 41.)  However, this letter was not before the ALJ for review, as it was submitted to the Appeals Council after the ALJ issued his decision.  The Sixth Circuit has held, when the Appeals Council considers new evidence but denies review, the district court's review is limited to the record available to the ALJ. *Cline v. Comm'r of Soc. Sec.,* 96 F.3d 146, 148 (6th Cir. 1996).  *See also Elliott v. Apfel,* 28 Fed. App'x 420, 424 (6th Cir. Jan. 22, 2002); *Martin v. Colvin,* 2016 WL 7009167 at *9 (N.D. Ohio Oct. 21, 2016).  As such, the Court will not include this letter in its recitation of the medical evidence.

6

Dr. Jeet continued Diaz's insulin regimen.  (Tr. 443.)  Diaz indicated continued fluctuations on February 23, 2015, and Dr. Jeet listed hypoglycemia unawareness as a symptom.  (Tr. 436.)  On April 23, 2015, Diaz relayed he was checking his blood glucose 5 times a day and his blood sugar was continuing to fluctuate.  (Tr. 431.)

On May 4, 2015, Diaz visited the emergency room after an episode of low blood sugar.  (Tr. 519.)  During this episode, Diaz became combative and his blood glucose dropped to a 28.  (*Id*.)  The EMS took him to the emergency room, where his hypoglycemia resolved.  (Tr. 518, 519.)  He did not require any hospitalization.

Diaz followed up with Dr. Jeet on July 30, 2015, indicating continued fluctuations in his blood sugar levels.  (Tr. 425.)  Dr. Jeet reviewed Diaz's blood sugar logs and noted one episode of bad hypoglycemia.  (*Id.*)  On October 29, 2015, Diaz's blood glucose fluctuations were minimal.  (Tr. 419.)

On November 17, 2015, Diaz returned to Dr. Alton for an eye examination.  (Tr. 450.)  His vision continued to be 20/20 with best correction.  (*Id*.)  His examination revealed "normal health[y] eyes," but "clinically significant macular edema retinopathy."  (Tr. 451.)  Dr. Alton advised Diaz he would monitor this condition.  (*Id*.)

Diaz followed up with Dr. Jeet on January 29, 2016, indicating minimal fluctuations in his blood glucose levels.  (Tr. 574.)  His A1c was 7.4.  (*Id*.)  Dr. Jeet listed Diaz's diabetes as uncontrolled and noted Diaz had a recent episode of hypoglycemia and an EMS visit.  (Tr. 574, 576.)

**C.      State Agency Reports**

      **1.      Mental Impairments**

On October 21, 2014, Diaz underwent a consultative examination with psychologist Charles Loomis, M.Ed.. (Tr. 583-589.)  Diaz reported his primary barriers to employment were his diabetes symptoms, including passing out at work and passing out at home and not showing up for work.  (Tr. 584.)  He relayed his physician suggested he file for social security.  (*Id*.)  Diaz reported he had passed out on the job 5-6 times.  (*Id*.)  Diaz reported no inpatient mental health treatment, but relayed he had been receiving counseling for depression.  (Tr. 586.)  He denied the use of any psychotropic medications.  (*Id*.)  Upon examination, his memory was average, he had no manifestations of anxiety, and a good fund of general information.  (Tr. 587.)

Based upon this examination, Mr. Loomis diagnosed unspecified depressive disorder, mild.  (Tr. 588.)  He provided the following opinion regarding Diaz:

> **Describe the claimant's abilities and limitations in understanding, remembering and carrying out instructions.**
>
> The claimant's ability to understand, remember and follow simple instructions would not appear to be significantly limited.  Functional intelligence is estimated to be within average limits and he possesses adequate ability to understand, follow and remember complex directions.
>
> **Describe the claimant's abilities and limitations in maintain[sic] attention and concentrations, in maintain[sic] persistence and pace, to perform simple tasks and to perform multi-step tasks.**
>
> The claimant's ability to maintain attention and concentration to tasks were well maintained.  Immediate and delayed memory functions were above average and he demonstrated good pace and persistence across the examination.  He would appear able to perform both routine and multi-step procedures.
>
> **Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**
>
> The claimant reports that when he worked that he generally got along with his coworkers and most of his supervisors although he does he report he was dismissed from a couple of jobs because of his medical condition and because

8

he was accused of sexual harassment.

**Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**

The claimant's ability to cope with the ordinary stressors and pressures of competitive work would not appear to be significantly limited by his mental health issues.  There is no reported history that emotional deterioration impacted his ability to engage in competitive work.

(Tr. 588-589.)

On November 4, 2014, state agency physician Larry Kravitz, Psy.D., reviewed Diaz's medical records and completed a Psychiatric Review Technique ("PRT").  (Tr. 68-69.)  He concluded Diaz had (1) no restrictions in activities of daily living; (2) mild difficulties in maintaining social functioning; (3) mild difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation.  (*Id*.)

On January 16, 2015, state agency physician Courtney Zeune, Psy.D., reviewed Diaz's medical records and completed a PRT.  (Tr. 94-95.)  She affirmed Dr. Kravitz's assessment.  (*Id*.)

### 2.    Physical Impairments

On September 19, 2014, state agency physician Rannie Amiri, M.D., reviewed Diaz's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 70-72.)  Dr. Amiri determined Diaz could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for 6 hours in an 8-hour workday.  (Tr. 70.)  Dr. Amiri found Diaz could frequently operate left upper extremity hand controls, never climb ladders, ropes, or scaffolds, occasionally crawl, frequently handle and finger with left upper extremity, and avoid all exposure to unprotected heights and hazards.  (Tr. 71-72.)

9

On January 7, 2015, state agency physician Gerald Klyop, M.D., reviewed Diaz's medical records and completed a Physical RFC Assessment.  (Tr. 96-98.)  Dr. Klyop adopted Dr. Amiri's assessments.  (*Id.*)

**D.    Hearing Testimony**

During the February 12, 2016 hearing, Diaz testified to the following:

- He graduated high school.  (Tr. 46.)  He last worked in July 2014 making seat parts for Ford vehicles.  (*Id.*)  Prior to that, he worked as a cashier at Walgreens and in the garden department at Home Depot.  (Tr. 47.)  He also worked answering customer inquires for T-Mobile.  (Tr. 48.)

- He lives alone in an apartment.  (Tr. 45.)  He spends time with friends.  (Tr. 56.)  His doctor, Dr. Jeet, currently will not give him medical clearance to work.  (Tr. 57.)

- He has had Type I diabetes since childhood.  (Tr. 50.)  He has lost jobs due to his diabetes, as he missed too much work due to low blood sugar.  (*Id.*)  He has "low sugar attacks" 1-2 times a week.  (Tr. 51.)  Sometimes during these attacks, it looks like he is having a seizure.  (*Id.*)  This occurs about once a month.  (Tr. 52.)

- His diabetes is brittle and out of control.  (Tr. 53.)  It has not yet impacted his vision, but he has gone to see a retina specialist.  (*Id.*)  He is supposed to check his blood sugar five times a day, but he only receives enough test strips to check three times a day.  (Tr. 55.)  During a typical day, his blood sugars range from 80 to 200.  (*Id.*)

The VE testified Diaz had past work as a laborer and information clerk.  (Tr. 58.)  The ALJ posed the following hypothetical question:

The first one is assume a hypothetical person claimant's age, education, and work experience limited to light work as defined by the regulations.  But further limited to only frequent pushing and pulling with the left upper extremity.  Frequent handling, fingering, and feeling with the left upper extremity.  Further limited to no climbing of ladders, ropes, or scaffolds.  Occasional crawling.  Avoid all exposure to unprotected heights, moving mechanical parts.  And this individual would also miss one day per month or be unable to complete one day per month.

10

(Tr. 59.)

The VE testified the hypothetical individual would be able to perform Diaz's past work an information clerk (semi-skilled, SVP 4, sedentary).  (Tr. 58-59.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order

11

to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe

impairment" is one that "significantly limits . . . physical or mental ability to do basic work

activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful

activity, has a severe impairment that is expected to last for at least twelve months, and the

impairment, or combination of impairments, meets or medically equals a required listing under

20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of

age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the

claimant's impairment or combination of impairments does not prevent him from doing his past

relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).

For the fifth and final step, even if the claimant's impairment does prevent him from doing his

past relevant work, if other work exists in the national economy that the claimant can perform,

the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Diaz was insured on his alleged disability onset date, July 16, 2014, and remained

insured through December 31, 2017, his date last insured ("DLI.")  (Tr. 28.)  Therefore, in order

to be entitled to POD and DIB, Diaz must establish a continuous twelve month period of

disability commencing between these dates.  Any discontinuity in the twelve month period

precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988);

*Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act
    through December 31, 2017.

2.  The claimant has not engaged in substantial gainful activity since July 16,

12

2014, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.      The claimant has the following severe impairments: type I diabetes mellitus and left trigger thumb (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can frequently push, pull, handle, finger, and feel with the left upper extremity. He cannot climb ladders, ropes, and scaffolds. He can occasionally crawl. He needs to avoid all exposure to unprotected heights and moving mechanical parts. He might be absent one day a month from work, or he might need to leave work early one day a month.

6.      The claimant is capable of performing past relevant work as an information clerk (DOT #237.367-022). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from July 16, 2014, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 28-35.)

# V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec*., 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld

14

where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.        Treating Source Opinion – Dr. Jeet

In his first assignment of error, Diaz argues the ALJ improperly considered the opinions of his treating endocrinologist, Dr. Jeet.  (Doc. No. 12 at 11.)  He asserts the ALJ "said very little about Dr. Jeet's opinions" and rejected "Dr. Jeet's opinion without explaining the weight given." (*Id.* at 13.)  Moreover, Diaz contends the "reasons offered by the ALJ were vague and in some instances were contradicted by the record."  (*Id*.)

The Commissioner maintains the ALJ properly discounted Dr. Jeet's opinions.  (Doc. No. 13 at 9.)  The Commissioner asserts as Dr. Jeet "summarily concluded that Plaintiff was unable to work," his determination "was not entitled to special deference."  (*Id*. at 10.)  Rather, the Commissioner argues, the ALJ was "only required to explain the consideration he gave to the

15

'opinion.'"  (*Id.*)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[5]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id*., as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this

---

[5]     Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

16

requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley,* 581 F.3d at 406.  Moreover, the "treating physician rule" only applies to *medical opinions*.  "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— [the ALJ] decision need only 'explain the consideration given to the treating source's opinion.'"  *Johnson v. Comm'r of Soc. Sec*., 535 Fed. App'x 498, 505 (6th Cir. 2013).  The opinion, however, "is not entitled to any particular weight."  *Turner*, 381 Fed. App'x at 493.  *See also Curler v. Comm'r of Soc. Sec.,* 561 Fed. App'x 464, 471 (6th Cir. 2014).

The ALJ considered the opinion evidence from Dr. Jeet as follows:

As of April 29, 2014, Anant Jeet, M.D., an endocrinologist, noted the claimant's disease course was worsening.  His last hemoglobin A1C was

elevated at 7.4 on April 18, 2014.  The claimant was advised to test his glucose five times daily (Ex. 1F, pp. 35, 36).  On June 15, 2014, it was noted the claimant had hypoglycemia and that he had a seizure recently.  He was not testing his glucose and eating on time (Ex. 2F, p. 52).  **At a visit on July 17, 2014, Dr. Jeet noted the claimant would not be able to work because of brittle diabetes (Ex. 1F, p. 40).**  The claimant had an office visit on December 18, 2014 and it was noted that his diabetes fluctuated.  The claimant reported compliance with treatment.  His weight was stable.  He reported he was following his diabetes diet, exercised intermittently, but that he only check his blood sugars one or two times daily.  Blood sugars fluctuated from 90 to over 200.  Overall range was 130-140.  The physical examination was within normal limits (Ex. 4F, pp. 48, 49).

***

On October 6, 2014, Anant Jeet, M.D., the claimant's endocrinologist, stated the claimant was unable to work and that he would be unable to work until further notice.  He had been treating the claimant since September 17, 2012 and that due to the severity of the claimant's diabetes and that it would be harmful for him or to others in a work environment (Exs. 3F, p.2; 4F, p. 63).  However, this is not supported by his treatment notes as noted below.

The claimant had an office visit on December 18, 2014 with Dr. Jeet and it was noted that his diabetes fluctuated.  The claimant reported compliance with treatment.  His weight was stable.  He reported he was following his diabetic diet, exercised intermittently, but that he only checked his blood sugars one or two times daily.  Blood sugars fluctuated from 90 to over 200.  Overall range was 130-140.  The physical examination was within normal limits (Ex. 4F, pp. 48, 49).  The evidence does not show the claimant's diabetes has required emergency room treatment or hospitalization.

(Tr. 32, 34-35.)(emphasis added.)[6]

The Court finds the ALJ properly considered the conclusions of Dr. Jeet.  Both of these statements were findings Diaz was "unable to work," and offered no specific functional

---

[6]     As noted *supra*, Diaz, in his Brief, references a June 26, 2015 letter from Dr. Jeet, in which Dr. Jeet concluded Diaz was unable to participate in community service. (Tr. 41.)  However, this letter was submitted to the Appeals Council after the ALJ rendered his decision.  As such, the Court will not include this letter in its analysis, as it was not before the ALJ for consideration.

18

limitations. (Tr. 275, 346.) Thus, these conclusions are not opinions of a medical condition. *See Morr v. Colvin,* 2015 WL 350384 at *5 (N.D. Ohio Jan. 26, 2015). Rather, they were opinions on an issue reserved for the Commissioner, and entitled to no special significance or deference. *See Turner,* 381 Fed. App'x at 493 and *Curler,* 561 Fed. App'x at 471. The ALJ's decision need only "explain the consideration given to the treating source's opinion." *Johnson v. Comm'r of Soc. Sec.*, 535 Fed. App'x at 505.

Here, the ALJ acknowledged the existence of the two times Dr. Jeet concluded Diaz was "unable to work." (Tr. 32, 34.) The ALJ rejected Dr. Jeet's September 2014 opinion, explaining it was not supported by the treatment notes. (Tr. 34.)[7] As the "good reasons" requirement does not apply here, this is all which was required of the ALJ. The ALJ was not required to defer to Dr. Jeet's statements regarding disability. *Morr*, 2015 WL 350384 at *5. Moreover, while the ALJ did not assign any particular weight to Dr. Jeet's conclusion, he was not required to do so. *See Turner*, 381 Fed. App'x at 493.

The ALJ's rejection of Dr. Jeet's disability opinion is supported by substantial evidence. As the ALJ correctly noted, Diaz's physical examination was within normal limits during a December 18, 2014 office visit. (Tr. 34, 395.) His A1c level was 6.9, indicating improvement from 7.4 in June 2014. (Tr. 394, 339.) Diaz's diabetes did continue to be uncontrolled, with dramatically fluctuating blood glucose levels for most of the relevant period.

---

[7] The Court acknowledges the ALJ did not specifically reject the July 2014 office visit notation that Diaz was "unable to work." However, the Court again notes this was not a medical opinion, and is therefore not entitled to any special significance or deference. Moreover, the conclusion Diaz was "unable to work" is the same conclusion reached in the September 2014 opinion, which the ALJ did specifically reject and analyze.

(Tr. 394, 441, 436, 431, 425.)  However, these fluctuations were minimal in October 2015 and January 2016.  (Tr. 419, 574.)  Prior to his alleged onset date, Diaz did report multiple episodes of hypoglycemia and seizure like symptoms.  (Tr. 339, 241, 254, 258.)  However, after his July 2014 alleged onset date, Diaz reported an episode of bad hypoglycemia to Dr. Jeet in May 2015 and January 2016.  (Tr. 425, 574.)  Finally, while Diaz has developed diabetic retinopathy, it is "not yet severe" and does not impact his vision or require any treatment.  (Tr. 417, 415.)

The Court acknowledges the ALJ erroneously concluded the "evidence does not show the claimant's diabetes has required emergency room treatment," when Diaz did in fact visit the emergency room in May 2015.  (Tr. 35, 518-519.)  However, the remainder of the ALJ's analysis in respect to Dr. Jeet is accurate and supported by substantial evidence.[8]  Moreover, Diaz had one emergency room visit during the entire relevant period.  As correctly noted by the ALJ, Diaz did not require hospitalization due to any diabetic complications or symptoms.

Diaz acknowledges the "ALJ is not required to give any special significance to [Dr. Jeet's] statement that Mr. Diaz could not work."  (Doc. No. 15 at 3.)  However, Diaz contends this "does not excuse a proper analysis of the medical opinions," as Dr. Jeet also opined Diaz "would be a harm to himself and others in a work environment."  (*Id*.)  However, this is not a specific functional limitation.  Dr. Jeet does not provide any particular limitations for Diaz, such no exposure to certain hazards or heavy machinery.  Rather, he summarily finds it would be "harmful for himself or to others for him to be in a work environment."  (Tr. 346.)  Dr. Jeet does

---

[8]     The Court may have found such an inaccuracy more troubling if it was being used to evaluate a treating source medical opinion.  However, as discussed *supra*, Dr. Jeet's conclusion Diaz is "unable to work" is not a medical opinion entitled to controlling weight or deference.

20

not offer any further explanation as to why *all* work environments would pose a risk to Diaz. Moreover, it is unclear why Dr. Jeet, as a medical professional, would have the requisite vocational knowledge necessary to conclude all work environments would be harmful for Diaz. Thus, this is simply an alternate way of restating his conclusion Diaz is "unable to work" and is not a medical opinion entitled to any special significance.

In sum, there is no evidence Dr. Jeet ever rendered an opinion offering specific functional limitations for Diaz.  The only opinions Dr. Jeet provided were generalized doubts regarding Diaz's ability to work.  As such, the ALJ was not required to provide "good reasons" or afford any special deference to Dr. Jeet's conclusions.  Diaz's first assignment of error is without merit.

**B.     RFC/Hypothetical**

In his second assignment of error, Diaz argues the RFC does not "sufficiently address the functional limitations resulting from his hypoglycemic unawareness and the potential harm to himself and others from the disease."  (Doc. No. 12 at 15.)  He asserts the ALJ did not properly discuss or account for Diaz's "inability to recognize or anticipate episodes of loss of consciousness caused by his hypoglycemic unawareness."  (*Id*. at 16.)  Diaz concludes the ALJ's RFC and hypothetical to the VE are not supported by the evidence, as they are "silent regarding the hypoglycemia unawareness."  (*Id*.)

The Commissioner maintains the ALJ "properly evaluated Plaintiff's statements regarding hypoglycemic attacks."  (Doc. No. 13 at 13.)  The Commissioner asserts the ALJ accounted for Diaz's hypoglycemic attacks in the RFC, "by restricting him to work involving no exposure to hazards, such as moving mechanical parts and unprotected heights; no climbing

21

ladders, ropes or scaffolds; and a monthly absence from work."  (*Id.* at 14.)  The Commissioner

contends if Diaz is alleging his hypoglycemia results in "seizure-like symptoms," the RFC

restrictions of no unprotected heights and hazards "normally accommodates infrequent seizures."

(*Id.*)

The RFC determination sets out an individual's work-related abilities despite their

limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an

administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An

ALJ "will not give any special significance to the source of an opinion on issues reserved to the

Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for

assessing a claimant's RFC, based on all of the relevant evidence.  *See* 20 C.F.R. § 416.946(c).

"Judicial review of the Commissioner's final administrative decision does not encompass

re-weighing the evidence."  *Carter v. Comm'r of Soc. Sec.*, 2012 WL 1028105 at * 7 (W.D.

Mich. Mar. 26, 2012) (citing *Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472 (6th Cir.

1982); *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414 (6th Cir. 2011); *Vance v.

Comm'r of Soc. Sec.*, 260 Fed. Appx. 801, 807 (6th Cir. 2008)).

A hypothetical question must precisely and comprehensively set forth every physical

and mental impairment that the ALJ accepts as true and significant.  *See Varley v. Sec'y of

Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  Where the hypothetical question is

supported by evidence in the record, it need not reflect unsubstantiated allegations by the

claimant.  *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990).  In

fashioning a hypothetical question to be posed to a VE, the ALJ is required to incorporate only

those limitations that he accepts as credible.  *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx.

22

425, 429 (6th Cir. 2007) (citing *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

However, where the ALJ relies upon a hypothetical question that fails to adequately account for

all of the claimant's limitations, it follows that a finding of disability is not based on substantial

evidence.  *See Ealy,* 594 F.3d at 516 ("In order for a vocational expert's testimony in response to

a hypothetical question to serve as substantial evidence in support of the conclusion that a

claimant can perform other work, the question must accurately portray a claimant's physical and

mental impairments."); *Brooks v. Comm'r of Soc. Sec*., 531 Fed. Appx. 636, 644 (6th Cir.  Aug.

6, 2013) ("We have stated on a number of occasions that a hypothetical question posed to a

vocational expert must include a 'complete assessment of [the claimant's] physical and mental

state and should include an accurate portrayal of her individual physical and mental

impairments.'") (citing *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 239 (6th Cir. 2002));

*Varley*, 820 F.2d at 779.

    Here, at step two, the ALJ determined Diaz suffered from the severe impairments of

type I diabetes mellitus and left trigger thumb.  (Tr. 28.)  After determining Diaz's impairments

did not meet or equal the requirements of a Listing, the ALJ proceeded, at step four, to consider

the medical and opinion evidence regarding Diaz's physical impairments.  (Tr. 30-35.)  Of

particular relevance, the ALJ discussed Diaz's allegations regarding his fluctuations in blood

sugar.  (Tr. 31, 32, 34.)  The ALJ noted Diaz had reported and testified when his blood sugar

would drop, he would pass out or fall asleep.  (Tr. 31, 32.)  The ALJ acknowledged Diaz's

testimony regarding his diabetes and episodes of low blood sugar, which had impacted him at

work.  (Tr. 32, 34.)  The ALJ discussed Diaz's testimony that he experiences low blood sugar 2-3

times a week, with one "severe attack per month."  (Tr. 32, 34.)  The ALJ also reviewed the

treatment records, and noted Diaz had an episode of hypoglycemia and a seizure in June 2014.

(Tr. 32.)

The ALJ formulated the following RFC:[9]

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can frequently push, pull, handle, finger, and feel with the left upper extremity.  **He cannot climb ladders, ropes, and scaffolds**.  He can occasionally crawl.  **He needs to avoid all exposure to unprotected heights and moving mechanical parts.  He might be absent one day a month from work, or he might need to leave work early one day a month.**

(Tr. 31.)(emphasis added).

The Court finds the ALJ did not err in the formulation of the RFC and associated hypothetical.  In the decision, the ALJ acknowledged the uncontrolled nature of Diaz's diabetes, with blood sugar fluctuations.  (Tr. 32.)  The ALJ also specifically referenced Diaz's June 2014 episode of hypoglycemia and seizure.  (*Id.*)  The ALJ noted Diaz's testimony regarding his blood sugar dropping 2-3 times a week, with "one severe attack per month."  (Tr. 32-34.)  The ALJ then accounted for this evidence in the RFC and hypothetical, by limiting Diaz from working near heights and hazards.  (Tr. 31.)  The ALJ even included a limitation allowing for one absence a month, thus accounting for Diaz's testimony he had a severe hypoglycemic episode each month.  (*Id.*)

Substantial evidence supports the ALJ's conclusion.  A review of the record confirms Diaz's blood sugar levels fluctuated dramatically and his diabetes was uncontrolled.  (Tr. 273, 390, 441, 436, 425.)  However, despite the uncontrolled nature of his diabetes, there is little

---

[9]    This RFC provides for the same limitations which the ALJ provided to the VE in his hypothetical. (Tr. 59.)

documentation of frequent episodes of severe hypoglycemia resulting in a loss of consciousness during the relevant period.  In June 2014, Diaz reported a recent episode of hypoglycemia and a seizure.  (Tr. 339.)  In May 2015, he visited the emergency room after an episode of hypoglycemia.  (Tr. 518-519.)  In January 2016, he reported a recent EMS visit due to hypoglycemia, but he did not visit the emergency room or hospital.  (Tr. 574.)  Other than these infrequent instances, the treatment records do not document regular episodes of loss of consciousness or seizure-like symptoms following the alleged onset date.  Despite the minimal objective medical evidence, the ALJ provided for one absence a month in the RFC, in order to account for Diaz's testimony.  (Tr. 52.)  Moreover, as the ALJ noted, Diaz has not required any inpatient hospitalization for diabetic complications.  (Tr. 35.)  While he has developed diabetic retinopathy, it is "not yet severe" and does not impact his vision or require any treatment.  (Tr. 417, 415.)  These treatment records provide substantial evidence in support of the ALJ's conclusion that, while Diaz does have uncontrolled diabetes with occasional hypoglycemia episodes, he still retains the ability to perform a reduced range of light work, with no exposure to hazards and heights and one absence a month.

Diaz maintains, however, remand is required because the "ALJ failed to include a discussion or finding about Mr. Diaz's inability to recognize or anticipate episodes of loss of consciousness caused by his hypoglycemic unawareness."  (Doc. No. 15 at 6.)  The Court disagrees.  While ALJ may not have specifically used the phrase "hypoglycemic unawareness," the ALJ did discuss Diaz's blood sugar fluctuations, including his testimony "his blood sugar would fall and that made him fall asleep."  (Tr. 32.)  The ALJ accounted for these episodes in the RFC and hypothetical, by restricting him from working near hazards or heights.  These

restrictions reasonably account for sudden, unanticipated episodes of low blood sugar.

Moreover, while Diaz cites internet articles describing "hypoglycemic unawareness," he does not

direct this Court to any medical evidence which supports a finding he is never able to anticipate

his episodes of low blood sugar.  (*See* Doc. No. 12 at 3, Doc. No. 15 at 6.)  In fact, at his

administrative hearing, Diaz testified he *was able* to tell when his blood sugar dropped because

he would become tired.  (Tr. 52.)  Finally, Diaz does not specify what additional limitations

should have been in the RFC to account for this "hypoglycemic unawareness," beyond

referencing Dr. Jeet's vague conclusion he was a "potential harm to himself and others."  (Doc.

No. 12 at 15.)

Accordingly, and for all the reasons set forth above, the Court finds the ALJ's RFC

determination and corresponding hypothetical are supported by substantial evidence.  Diaz's

second assignment of error is without merit.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

final decision be AFFIRMED.


*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: May 8, 2018

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of
Court within fourteen (14) days after the party objecting has been served with a copy of
this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within
the specified time may waive the right to appeal the District Court's order.  *See United
States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g
denied*, 474 U.S. 1111 (1986).**